NOT DESIGNATED FOR PUBLICATION

No. 118,786

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
P.R.A.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed June 1, 2018.
Affirmed.

*Lucy C. Hesse*, of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM: G.A.A. (Father), the natural father of P.R.A., a daughter born in 2008, appeals the district court's determination that P.R.A. was a child in need of care. We find clear and convincing evidence supporting the district court's determination that P.R.A. was a child in need of care. Thus, we affirm.

*Factual Background*

P.R.A. has been adjudicated as a child in need of care (CINC) in two previous instances—once in 2008 and once in 2012. In the 2012 case, Father initiated proceedings to terminate Mother's parental rights. The third time, the State filed a CINC petition on June 19, 2017, out of concern that Father was not adequately providing for P.R.A.'s care

1

and protection, due in part to his substance abuse, mental health issues, and failure to provide a safe and stable living environment.

At the temporary custody hearing, Father waived his right to an evidentiary hearing, and the district court found it in P.R.A.'s best interests to remain in the custody of the Kansas Department for Children and Families (DCF) in an out-of-home placement. At the evidentiary adjudication hearing, Father, Christina Smeltzer (P.R.A's godmother), and Shelly Fields, a DCF social worker, testified. We summarize their testimony below.

Father testified to his housing situation, his drug history, and his employment history. Father had been living with friends for a couple of months leading up to the evidentiary hearing. Before that, he lived in a hotel because his house caught fire. Before that, he had been homeless for a short time. And his current home is being foreclosed on. Father had been working for Johnson Controls for a little over a month, and before that he worked for Brad Rainey Construction for a few weeks. He had not had full time employment since June 2016. Father uses methamphetamine and his drug problem started after he lost his job. Father was using drugs when he began working with Fields in January 2017.

DCF contacted Father on January 8, 2017, when he did not pick up P.R.A. from school because he had been taking a nap. About a week later, Father was late again picking P.R.A. up from school. DCF intervened, but Father contends his daughter's afterschool program was not yet over. Father went to the school and created a disturbance, getting into an argument with police and the principal.

Fields then began working with Father, and they discussed expectations, goals, and a case plan. With the goals of improving his mental health, maintaining stability for P.R.A., and completing random drug tests, Father agreed to go to the Mental Health

Association (MHA) for treatment. His hair follicle test from January 8, 2017, came back positive.

A couple months later, in March 2017, DCF performed another intake citing lack of supervision. Although the house had been previously burglarized, Father left P.R.A. home alone late at night because he was driving for Uber. Father testified that P.R.A. had a flip phone to call him if she needed to contact him.

That spring break, P.R.A. went to stay with her godmother, Christina Smeltzer, and her family. Father testified that she was originally supposed to stay for two or three days, but he arranged for P.R.A. to stay for the entire week. Father testified that when the week was over he did not pick her up until 11 p.m. or 12 a.m. because he was driving for Uber. But Smeltzer testified that Father did not pick the child up until 3:30 a.m. Smeltzer had not had regular contact with him during the week and was concerned. Smeltzer said that P.R.A. was upset when she had not heard from Father, and that she wanted to go home. Father admitted that he was still using methamphetamine at this time.

On March 28, DCF performed another intake for P.R.A. because once again Father did not pick her up from school. Father explained that he had been working out of town on a roofing job and had been left behind at the jobsite without a phone. Father knew he was late to pick up P.R.A. so he started walking back to Wichita, but it was 11 p.m. by the time he got back to town. He assumed that P.R.A. was at the Children's Home, but waited until the next day to call. P.R.A. was released to Smeltzer.

While P.R.A. stayed with Smeltzer, Father had regular access to her in person and by phone. He was supposed to call her every night, but when that did not happen, the child would get very upset. If Father did not call multiple nights in a row, P.R.A. would stop asking if he was going to call.

3

Father and Fields began discussing ways to keep P.R.A. from having to go to the Children's Home. Father testified that Fields asked if he would be willing to work out a guardianship agreement with Smeltzer. He told Fields that if she could give him a "clear path" to getting P.R.A. back, then he would agree to the guardianship. Fields spoke with Father about the expectations DCF had for him—to maintain appropriate housing, address his mental health issues, and maintain sobriety. Despite DCF providing funding to pay for the guardianship, the guardianship was not completed. Father testified that this was because Fields had not provided him with a written document stating what he had to do to get P.R.A. back.

Fields testified that she was not comfortable leaving P.R.A. in Father's care without a guardianship in place and that she had submitted a CINC affidavit because she believed that P.R.A. needed an out-of-home placement. She was concerned about Father's mental health, sobriety, work and living situations, and lack of family support. Father testified that at the time he and Fields discussed guardianship for P.R.A., he would not have been able to provide a clean drug test, had not obtained an evaluation from MHA, and was not enrolled in drug treatment. Father testified that once he obtained his mental health evaluation in April, he attended four of eight treatment sessions, but Fields testified he only attended three out of nine sessions with MHA.

Fields maintained contact with Father while P.R.A. was out of the home. During that time, Father told Fields that he was not attending drug and alcohol treatment, that any drug test he took would come back positive, and that if she did not hear from him she should be concerned because that meant he was not sober. For a period of time at the end of May, Father did not have contact with Fields or Smeltzer. Fields then tried to contact Father both at his house and the hotel where he previously stayed, but she could not get in touch with him.

Smeltzer contacted Fields in June and expressed concerns about Father's unpredictable behavior. Father had texted Smeltzer belligerent text messages that she then forwarded to Fields. Smeltzer testified that Father had texted her that he was going to "send people down" to get P.R.A. Smeltzer became concerned about Father's unpredictability and her family's safety. Father would also text Fields—sometimes just once, other times up to ten times in a row. Ultimately, Fields blocked Father's number on her cell phone because he was threatening her. At that time, Father would not tell Fields where he was staying, and Father always had excuses for not completing the tasks asked of him.

P.R.A. remained with Smeltzer for a while, then went to live with Father's cousin upon Father's request. Father told the court that he preferred that P.R.A. stay with his cousin for educational purposes.

Fields testified to P.R.A.'s views on the situation. P.R.A. had told Fields that she loves Father and is concerned about his health. P.R.A. described times that Father had taken her to strangers' homes where she would stay in the living room while he went to the back. P.R.A. had also told law enforcement officers that strangers went in and out of her home. These accounts made Fields suspect that Father was selling drugs.

Fields testified that Father was largely noncompliant throughout the case. She sent a referral to MHA on January 12, 2017, but Father did not meet with them until a month later. After Father created a case plan with MHA, he missed two appointments and MHA was not able to locate him. Fields also testified that DCF had provided Father with funding to get a substance abuse assessment in March, but he did not do the assessment until a month later. Despite Father's lack of progress, Fields explained that she continued to give Father an opportunity to work on the case plan because he had cooperated at the beginning and she wanted to give him a chance.

5

The district court found that P.R.A. was a child in need of care, as that phrase is defined in K.S.A. 2017 Supp. 38-2202 (d)(1) and (2). The court specifically discussed Father's lack of stable housing, his previous charges of manufacturing and selling methamphetamine, his drug abuse, his leaving P.R.A. home alone, and his inconsistent participation with MHA.

Father appeals.

*Does clear and convincing evidence supports the district court's finding that P.R.A. is a CINC?*

*Standard of Review*

Before a district court can adjudicate a child to be in need of care under K.S.A. 2017 Supp. 38-2251, the court must find the child's circumstances fit within one of the categories defining "child in need of care" under K.S.A. 2017 Supp. 38-2202(d). In this case the district court relied upon K.S.A. 2017 Supp. 38-2202(d)(1) and (2), which states, "a person less than 18 years of age . . . who:

"(1) Is without adequate parental care, control or subsistence and the condition is due solely to the lack of financial meas of the child;s parents or custodian;

(2) is without the care or control necessary for the child's physical, mental or emotional health."

We focus our review accordingly.

In an adjudication hearing, the district court must find the State proved that the child meets the statutory definition for being in need of care by clear and convincing evidence. K.S.A. 2017 Supp. 38-2250; *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008). That is a comparably demanding standard requiring all necessary facts be proved

6

"highly probable." See 286 Kan. at 696. At adjudication, if a district court determines a child is a CINC, the case continues. If the child is not a CINC, then the district court should dismiss the case. See K.S.A. 2017 Supp. 38-2251(a) and (b).

When we review a district court's determination that a child is in need of care, we determine whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational fact-finder could have found it highly probable, i.e., by clear and convincing evidence, that the child was a CINC. K.S.A. 2017 Supp. 38-2250; *In re B.D.-Y.*, 286 Kan. at 705. In doing so, we do not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705. After viewing the evidence here in the light most favorable to the State, we are convinced that the district court correctly determined that P.R.A. was a child in need of care.

*Analysis*

Father's inconsistent work history and unstable housing contributed to the district court's finding that P.R.A. was a CINC. Father has not held a consistent, full-time job since 2016, and he does not have stable housing. He has lived in motels and with friends, and his house is in the midst of a foreclosure. When he and P.R.A. were living in their house, it was burglarized twice.

Father has a history of drug abuse. His drug of choice is methamphetamine, and his drug tests have tested positive for methamphetamines and amphetamines. He has previous drug related charges, including manufacturing and selling methamphetamine.

The evidence shows that P.R.A. was not adequately supervised. DCF intervened on a number of occasions, as Father has left P.R.A. stranded at school multiple times. Once when he did so, he assumed she had been taken to the Children's Home but did not call until the next morning. Father left P.R.A. at home—a home that was twice the target

7

of a burglary—alone, late at night. He takes P.R.A. to the homes of others, leaving her in the front room while he goes to the back. Father allows strangers in his home as well. These events, as well as Father's drug abuse history, led Fields to suspect that Father was selling drugs.

Father was not fully compliant during the course of this case. Fields gave Father DCF funds to complete a mental health evaluation in February, but he did not complete it until a month later. Father claims he attended half of the sessions with MHA, but the State's evidence shows that he attended three out of nine MHA sessions. Finally, although DCF offered to fund a guardianship for P.R.A., Father refused.

Father's lack of compliance is not without reasonable efforts from Fields and DCF to help Father. Fields remained in contact with Father, even when P.R.A. was with Smeltzer. Father's choices and behavior did not change, despite adequate resources and sufficient time to do so. The district court acknowledged that Father had ample time to alter his behavior and remarked that the CINC petition should have been filed earlier than it was.

After viewing the evidence in the light most favorable to the State, we agree that P.R.A. is without adequate parental care, control, or subsistence and that this condition is not due solely to lack of Father's financial means. We are convinced that a rational fact-finder would have found it highly probable that P.R.A. was a child in need of care. Accordingly, we affirm.